UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| HEATHER HUMPHRIES | CIVIL ACTION NO. 04-0670 |
|---|---|
| VERSUS | JUDGE ROBERT G. JAMES |
| RICHARD FEWELL, ET AL. | MAG. JUDGE KAREN L. HAYES |

## RULING

Pending before the Court are two post-trial motions: (1) "Defendants' Motion to Set Aside Verdict [sic] Alternatively for New Trial" ("Motion to Set Aside Verdict") [Doc. No. 62] and (2) "Defendants' Motion for New Trial" ("Motion for New Trial") [Doc. No. 71]. Plaintiff Heather Humphries ("Humphries") has filed memoranda [Doc. Nos. 66 & 75] in opposition to the Motion to Set Aside Verdict and to the Motion for New Trial.

For the following reasons, the Motion to Set Aside Verdict and Motion for New Trial are DENIED.

I.  **Pertinent Facts and Procedural History**

Humphries brought suit against Sheriff Richard Fewell ("Fewell") and Deputies Darrell Johns ("Johns") and Eric McElroy ("McElroy")[1] based on events that occurred at her home after Johns and McElroy responded to her roommate's complaint to the Sheriff's Department about a

---

[1]Humphries also brought suit against Reserve Deputy Robert Holtzclaw, but dismissed the claims against him prior to trial.

1

neighbor. Humphries alleged that Johns and McElroy were liable for violations of 42 U.S.C. § 1983 and state law on negligence. Humphries further alleged that Fewell was liable under a theory of vicarious liability for Johns' and McElroy's negligence.[2]

**A.     Voir Dire**

On November 14, 2005, the Court conducted voir dire of the potential jurors in this case. As part of the voir dire, the Court asked the following questions:

(1)   Ladies and gentlemen, does any member of your immediate family or any of your close personal friends . . . have any close relationship or employment relationship with any of the parties in this case?

(2)   All right. Thank you very much. Is there anyone else that has any relationship of that sort with any of the parties in this case?

(3)   All right. Ladies and gentlemen, have any of you or any member of your immediate family ever have or do you anticipate having unfavorable dealings with any of the parties in the case? And essentially that would be the plaintiff, Heather Humphries, or the Ouachita Parish Sheriff's Department or Sheriff Fewell or Deputies Johns or McElroy?

(4)   Ladies and gentlemen . . . do any of y'all have any other matter that comes to mind that you should call to the attention of the parties that might affect either your qualifications or your ability to be fair or impartial in this case? Can you think of anything else you should call to the attention of the parties?

(5)   Ladies and gentlemen, have any of you or your families or close friends ever had an unfavorable experience or feel that you may been treated unfairly by law enforcement authorities?

(6)   Ladies and gentlemen, have any of you or your immediate families or close personal friends ever been arrested for a crime? . . . Do any of you feel like you've ever had any interaction with the - - - either law enforcement authorities that were

---

[2] Humphries dismissed her Section 1983 claim against Fewell before the case was submitted to the jury.

- - - where the - - - I guess the word unfavorable earlier but where maybe you felt like law enforcement was unjustified in the way they treated you or act[ed] toward you or a family member? Have any of you had any experience of this sort?

(7) Ladies and gentlemen, have any of you or any of your immediate family members ever been the victims of a crime?

(Transcript, pp. 19, 24, 31, 32). Potential juror, Mary Ann Riddle ("Riddle"), failed to raise her hand or answer affirmatively to any of these questions. Riddle was selected as one of the eight members of the jury. After the jury was seated, the members selected Riddle as their foreperson.

**B.     Trial**

Trial began in the afternoon of the first day, November 14, 2005. The jury heard testimony from Humphries; Humphries' roommate, Tammy Bailey ("Bailey"); McElroy; Johns; and Reserve Deputy Robert Holtzclaw ("Holtzclaw").

According to the testimony, on March 31, 2003, Bailey telephoned the Sheriff's Department to complain that their neighbor's son, T.J. Plumley, was playing music too loudly. McElroy, Johns, and Holtzclaw arrived at the residence to investigate the complaint. Johns took the lead in the investigation. After he exited his vehicle, Johns began recording the investigation.

From the testimony of witnesses and the audiotape, it was clear that Humphries was agitated when the officers arrived. After she and Bailey spoke with the officers about the situation, Humphries asked them to leave and stated that she would contact Sheriff Fewell to complain. The officers did not leave. Shortly thereafter, Humphries and Bailey's neighbor, Timothy Plumley[3], drove into their driveway. Humphries became more agitated and began

---

[3]Defendants listed Timothy Plumley as a witness and stated during opening arguments that he would be called as a witness, but Defendants chose not to call him. Thus, the jury heard

3

walking towards Timothy Plumley's vehicle and yelling at him to get off her property. Johns told Humphries several times to "get back." [Exh. 201].

At one point while Johns and Humphries were near Timothy Plumley's vehicle, Johns stated "don't hit me," and Humphries can be heard on the audiotape stating, "I ain't going to hit you." [Exh. 201]. It is undisputed and clear on the audiotape that Humphries was upset and used foul language, but Humphries and Bailey testified that Humphries never hit or pushed Johns. Consistent with their testimony in court, Humphries can be heard on the audiotape stating that she never touched Johns, and Bailey can be heard replying that she knew that to be the truth.

In contrast, Johns testified that Humphries pushed him twice, leading to her subsequent arrest for battery. McElroy had his back turned and did not see whether Humphries hit, pushed, or put her hands on Johns. Holtzclaw testified that they did not see Humphries hit or push Johns, although Holtzclaw did see Johns step or move back[4] before he said, "don't hit me." It is undisputed that Johns grabbed Humphries by the arm before he handcuffed her.

Johns, McElroy, and Holtzclaw testified that Humphries struggled during her arrest. Humphries and Bailey testified that Humphries did not and could not physically resist arrest because of Johns' hold on her. It is undisputed that Johns handcuffed Humphries with two sets of handcuffs because the first pair of handcuffs were bent.

---

only those statements made by Timothy Plumley on the audiotape played in open court. Although a portion of the tape is inaudible, Timothy Plumley is heard explaining that Humphries had every right to be upset and asking that Humphries not be arrested.

[4]Johns admitted at trial that he had testified during his deposition that Humphries' pushes did not have enough force to make him step back.

Humphries presented her own testimony and that of Bailey; her mother, June Humphries; two co-workers, Starr Pankey and Carla Meredith; and her doctor, Craig Turner, in support of her damages claim. Humphries, who has an associate's degree in criminal justice, lost her job with the District Attorney's office as a result of this arrest. Humphries presented other testimony and evidence that she incurred the cost of hiring an attorney to represent her in the criminal case, that she has a scar on the top of her right hand, and that damage to her wrists and hands has affected her ability to engage in activities she enjoyed before this incident.

On the second day of trial, November 15, 2005, the case was submitted to the jury at 4:15 p.m. During deliberations, the jury sent three notes to the Court. After about one hour, the jury sent out its first note, asking for the evidence tape and transcript of the incident in question, the handcuffs, and the pictures of Humphries' hands and wrists. The items were sent to the jury.

After three more hours, the jury sent out a note indicating that they were deadlocked. At that time, the Court brought the jurors back into the Courtroom and issued an "Allen" charge. Defendants did not object to the reading of the *Allen* charge.

After further deliberation, the jury sent out a third note requesting the dollar figures for damages that Humphries' counsel suggested in his closing argument. The Court sent a note back explaining that no transcript of the closing arguments was available and that the jury would have to rely on its collective memory.

That evening, the jury rendered its verdict, finding that Humphries established by a preponderance of the evidence that Johns and McElroy committed violations of 42 U.S.C. § 1983 and state law against negligence. The jury awarded Humphries compensatory damages from

5

Johns and McElroy and punitive damages from Johns alone.

### C. Post-Trial Allegations and Evidence

On November 16, 2005, the day following the jury's verdict, Defendants contend that the jury foreperson, Riddle, contacted Lieutenant Tom Hargrove ("Hargrove"), a detective for the Sheriff's Department, to "gloat" about the jury's verdict. Defendants claim that Riddle and Hargrove previously had an intimate relationship which had been terminated by Hargrove. They further claim that Riddle previously expressed to Hargrove an "extreme dislike" for the police that arose from an unfavorable experience she had with a police officer. Defendants also allege that Riddle previously made a complaint to police about harassing telephone calls she received, a fact which she failed to disclose during voir dire.

Defendants did not submit an affidavit or other admissible evidence in support of their allegations. On February 9, 2006, the Court ordered Defendants to "submit an affidavit or other appropriate evidence from Lieutenant Tom Hargrove no later than **February 23, 2006**." [Doc. No. 81].

#### 1. Affidavits Submitted by Defendants

On February 27, 2006, four days late, Defendants submitted affidavits from Hargrove and Albert D. Edmiston ("Edmiston"), an officer with the Monroe Police Department. Defendants did not offer any explanation for their untimely filing, nor did they seek leave of court to file their affidavits.

Additionally, Hargrove's affidavit is inconsistent with the tone, if not the content, of Defendants' previously filed memorandum. In contrast to the allegations in Defendants'

6

memorandum, Hargrove's affidavit makes clear that he and Riddle continued to have some type of "intermittent relationship" since the mid-1990's. [Doc. No. 82-2, ¶3]. While Hargrove testifies that he received a call from Riddle on the morning of November 17, 2005, he does **not** testify that she "gloated" about the jury verdict. Instead, he states that she informed him that she was on a federal jury which had rendered a verdict for the Plaintiffs, but refused to "get into" how much the jury awarded. [Doc. No. 82-2, ¶2]. He also testifies that Riddle had expressed "an extreme dislike for persons involved in law enforcement, but most particularly, persons working for the Monroe Police Department." [Doc. No. 82-2, ¶ 4]. He recounted an incident approximately two months prior to trial when he was visiting Riddle at her home, and they were discussing how New Orleans police officers were being portrayed in the media following Hurricane Katrina. According to Hargrove, Riddle stated that Monroe police officers were worse than those in New Orleans.

In his affidavit, Edmiston states that he has known Riddle "all of his life and is well acquainted with her." [Doc. No. 82-3, ¶ 2]. He testifies that Riddle had an unfavorable experience with a Monroe police officer named J. Nelson in the late 1990's and that this experience had a "long lasting effect on Riddle, especially as to her views toward law enforcement." [Doc. No. 82-3, ¶ 2]. He further testifies that Riddle "holds a strong bias against persons involved in law enforcement in general, and especially toward members of the Monroe Police Department." [Doc. No. 82-3, ¶ 3].

    **2.**     **Evidentiary Hearing**

Given the testimony of Edmiston and Hargrove, the Court determined that an evidentiary

7

hearing was necessary. The hearing was held on March 24, 2006. The Court heard testimony from Riddle, Hargrove, and Edmiston.

### a. Testimony of Riddle

Riddle was the first to testify. She has been a teacher for the past 27 years and has taught American history for the past ten years. For the past ten years, she has also served on the board of directors for Teen Court of Northeast Louisiana.

Counsel for Defendants questioned Riddle about her responses during the voir dire examination. He asked her whether she had a personal relationship with Hargrove. Riddle indicated that she was acquainted with Hargrove, but would not say that they currently have a personal relationship because she defines a personal relationship as one in which the parties visit or communicate regularly. She agreed that, at one time, she and Hargrove did have a personal relationship, but would not characterize their relationship as "personal" in more recent years. However, she testified that he did stop by her home after church on some Sundays.

On one such occasion a couple of months before the trial, Riddle testified that Hargrove stopped by her home to visit, but left after they got into a disagreement over the Hurricane Katrina situation and how sympathetic everyone should feel for the homeless who had to leave New Orleans.

While she did not mention during voir dire that she had a past relationship with Hargrove, Riddle recalled that she did reveal her current relationships with law enforcement. She testified during voir dire that her cousin (Edmiston) works for the Monroe Police Department and that her brother is a district attorney in Avoyelles Parish.

Counsel for Defendants questioned Riddle about her failure to respond to the question regarding whether she had ever had an unfavorable experience with or felt that she had been treated unfairly by law enforcement authorities. Riddle replied that she did not recall having an unfavorable experience with "the sheriff's department." When counsel pointed out that question was not limited to the sheriff's department, she stated that she must have "misinterpreted the question."

Riddle agreed that if she had interpreted the question correctly, she would have answered "yes" based on an unfavorable experience she had with an officer with the Monroe Police Department several years ago. While on her way home from the mall in October 1998, she took a sharp turn and drove her car into a ditch. She called her brother to help, but while waiting for him to arrive, a Monroe police officer drove up. She felt that the officer harassed her in the belief that she was intoxicated. She recounted this incident to several people, including Edmiston.

Counsel also asked her about an incident when a Monroe police officer was called to her home about excessive noise from a graduation party for her niece a couple of years ago. Riddle stated that the officer was "very nice" and that she was not "upset" about that incident at all. According to Riddle, the officer handled the situation "very appropriately" and that he gave her a "favorable impression."

During further questioning from counsel for Defendants, Riddle also stated that she did not respond affirmatively to the question regarding whether she had been the victim of a crime because she did not recall ever making a report to the Sheriff's Department. When counsel

9

reminded her of a complaint in April of 2002 about a student making threats, she recalled the situation, but did not recall how it was handled. She noted that she is "not a detailed person" and that she does not "recall a lot of details."

Counsel for Defendants then asked if Riddle called Hargrove the morning after trial. She testified that she did not "recall" calling Hargrove.

During questioning by Plaintiff's counsel, Riddle testified that she is on the board of the Garden District Neighborhood Alliance and that the group had recently invited the Monroe Police Department to give a talk on crime prevention. She characterized the relationship between her group and the Monroe Police Department as "good."

Riddle further revealed that not only is her brother currently a district attorney in Avoyelles Parish, but that her father was the district attorney in that parish from the time that she was a child in the 50's until 1972.

Despite the incident in 1998 with the Monroe Police officer, Riddle testified that she is an "impartial person"; that, as a teacher, she has learned to be "fair" and to "listen to both sides"; and that on the day of the trial she felt that she could be "fair and impartial to both parties."

With regard to the incident about threats from a former student, Riddle stated that she did not have a "grudge" against the Sheriff's Department and had "forgotten about" the incident altogether.

        **b.**        **Testimony of Hargrove**

Defendants then called Hargrove to testify. Hargrove has been employed with the Sheriff's Department for the past twenty years.

Hargrove testified consistently with Riddle that they dated several years ago. When the relationship initially ended, they did not speak for a year or two. After that time, Hargrove and Riddle have "remained friends," and he would stop by her home every six months or so.

On the last occasion, he testified that he stopped by Riddle's home after church, but left after they got into a disagreement over the Hurricane Katrina situation in New Orleans. According to Hargrove, Riddle commented that the police in New Orleans were not as bad as the officers in the Monroe Police Department. He said that he left because of her comments.

According to Hargrove, Riddle referred to the Sheriff's Department as "macho deputies" and that she liked the Monroe Police Department even less than she did the Sheriff's Department. He said that "on an individual basis she might get along with anybody," but that she was not happy with the Monroe Police Department or the Sheriff's Department as an "entity."

Hargrove testified that Riddle called him the morning after the trial[5] at about 7:30 A.M. She said that she had seen him on the news or saw something about him in the newspaper and asked "what's been going on?" In response, he asked her what had been "going on" with her, and she replied she had been on a jury. When he asked for details, she said that she "shouldn't talk about it." He asked if it was still going on, and she said, "no, it's over." When asked, she said it was a federal trial, and then Hargrove asked if it was the case involving the Sheriff's Department. He then asked her, "how did you find," and she said "we found for the plaintiff." He said, "you're kidding," and she replied, "no." When he asked for the amount of the verdict,

---

[5]The trial ended on November 15, 2005, but in his affidavit, Hargrove stated that Riddle called him on the morning of November 17, 2005, two days after trial. [Doc. No. 82, ¶ 2].

11

she said that she "shouldn't tell."  The conversation then ended.

### c. Testimony of Edmiston

Edmiston testified last.  He has been a police officer with the Monroe City Police Department for the past fourteen years.  He and Riddle are "distant" cousins, but he has known Riddle his entire life.  In his childhood, his family would go to her house to visit, but now they just see other from "time to time."  He testified that Riddle's father actually raised his mother.

Edmiston testified that Riddle had told him about the experience she had with another Monroe police officer in 1998 following her car accident.  According to Edmiston, she related that not only did the officer accuse her of being intoxicated, but that he also "ended up asking for her phone number."  She was "very angry" at the time, but has not brought the incident up again.

Edmiston testified that approximately one and one-half to two years ago, Riddle told him about the incident when a police officer came to her house during a party she was having for some "high school kids."  She asked Edmiston if the police "didn't have anything else to do than to come out to her house and embarrass her and make her turn down the music?"

Edmiston further testified that he had never heard Riddle say anything positive about law enforcement.

### 3. Post-Hearing

Following the hearing, both parties submitted supplemental briefs on March 29, 2006. The Court is now prepared to rule on both motions.

## II. Analysis

The sole basis for Defendants' Motion to Set Aside Verdict is Riddle's failure to disclose

certain information during voir dire. Defendants make five arguments in support of their Motion for New Trial: (1) Riddle's bias and prejudice; (2) excessive award of general damages; (3) lack of evidence as to Defendant McElroy; (4) jury's disregard of the evidence to support Defendants' contention that Johns and McElroy acted objectively and reasonably; and (5) "irreconcilable" findings that Johns and McElroy acted both negligently and willfully.

### A. Claims Regarding Riddle in Motion to Set Aside Verdict and Motion for New Trial

In support of their motions, Defendants claim that their right to meaningfully exercise their peremptory challenges was denied or impaired when Riddle, intentionally or unintentionally, failed to disclose during voir dire that (1) several years ago she had an intimate relationship with Hargrove, (2) she expressed an "extreme dislike" for law enforcement to Hargrove and Edmiston, (3) she had an unfavorable encounter with a Monroe police officer several years ago; and (4) she had made a complaint to the Sheriff's Department one time about harassing telephone calls she received from a student.

> To obtain a new trial based on a juror's failure to disclose information during voir dire, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only the reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial.

*McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

Initially, the Court must determine whether Riddle failed to answer honestly a material question on voir dire. The Court has listed the seven (7) voir dire questions upon which Defendants rely. First, the Court finds that none of the questions can be interpreted as requiring

13

Riddle to reveal that she once had a romantic relationship with Hargrove.[6] Therefore, Riddle had no duty to disclose this past relationship.

Second, the Court finds that Riddle unintentionally failed to disclose that she made a complaint to the Sheriff's Department about harassing telephone calls she received from a student in 2002. However, there is no evidence that Riddle was dishonest when she failed to equate this one incident with being a "victim of crime." Riddle's testimony was credible that she simply forgot the incident and did not remember the resolution of the matter even after being reminded of the incident by Defendants' counsel. Thus, the Court is not persuaded that Riddle failed to answer this voir dire question honestly.

Third, the Court finds that the evidence is insufficient to show that Riddle has a bias towards the Sheriff's Department that she failed to disclose. Riddle was not asked during voir dire whether or not she had ever expressed any negative feelings or views of law enforcement. She was asked if she had a bias or if there was any reason why she could not be fair and impartial in this case. Riddle testified that she believed herself to be fair and impartial. Riddle indicated at the hearing that she was around law enforcement authorities her whole life because her father was a district attorney for many years, and her brother is currently a district attorney. Hargrove and Edmiston characterize Riddle's complaints about prior incidents with law enforcement and

---

[6] If Defendants wished to inquire whether any jurors had previously dated law enforcement personnel, they could have requested that the Court ask this question during voir dire. *See United States v. Wilson*, 116 F.3d 1066, 1086 (5th Cir. 1997), *opinion vacated on other grounds, United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) (When the defendant "simply failed to request that the court post the relevant questions to the venire," then the "traditional *McDonough* framework [was] inapplicable.").

her alleged reference to "those macho deputies," as evidencing her bias towards all law enforcement authorities, but they are both law enforcement officers, and Hargrove is an employee of the Defendant in this matter. The fact that Riddle might have complained or made a negative comment about law enforcement to her cousin, a police officer, and her then-boyfriend, a deputy, is not sufficient to show that she failed to answer the voir dire questions honestly. Notably, even Hargrove testified that Riddle could judge individuals separately from a police entity. That is exactly what Riddle was asked to do in this case–judge the actions of two individual deputies.

Fourth, the Court finds that Riddle did fail to disclose an unfavorable encounter she had with a Monroe police officer several years ago. At the evidentiary hearing, Riddle was clear that she considered the 1998 encounter with a Monroe police officer to be an "unfavorable experience." If she had not mistakenly understood the Court's voir dire question to be limited to the Sheriff's Department, she would have revealed this incident. Therefore, at least on the basis of the incident with the Monroe police officer, Riddle objectively failed to disclose information that was responsive to a voir dire question.

While Defendants were able to carry their burden on the first prong, however, they cannot meet their burden under the second prong. If Riddle had revealed that seven years ago she had an unfavorable encounter with a Monroe police officer, Defendants would not have had a valid basis for a cause challenge. The testimony about this incident showed only that she believed that she was treated unfairly by the officer and complained to several people at the time, including Edmiston, but had not mentioned it to Edmiston since. Nothing about this one encounter

15

suggests that she is biased against all law enforcement authorities, nor against the Sheriff's Department in particular.

Defendants have not presented sufficient evidence to require this Court to set aside the jury verdict or to order a new trial on the basis of Riddle's answers to voir dire questions. After receiving all evidence presented by affidavit and testimony, the Court finds that there was no valid basis for a challenge for cause. Ultimately, Riddle's testimony was credible that she believed at the time of trial that she could be fair and impartial to all parties and that she acted accordingly as a juror.

### B.   Additional Arguments Regarding Motion for New Trial

Defendants' remaining arguments are in support of their Motion for New Trial. With regard to their claims that there was a lack of evidence as to Defendant McElroy, that the jury disregarded evidence to support Defendants' contention that Johns and McElroy acted objectively and reasonably, and that there was a lack of evidence to support a punitive damages award against Johns, the Court has previously determined in its ruling on Defendants' Rule 50 motion that the verdict is supported by the evidence. The Court has engaged in a thorough review of the entire record in this matter, including the audiotape of the incident, and finds no reason to change its previous determination.

Defendants also claim that the general damages of $67,500.00 for pain and suffering, mental anguish, disability and/or disfigurement in this case was excessive. Defendants argue that Humphries' evidence in support of her damages showed only that she was fired from her job in the district attorney's office, but not that she was prevented from pursuing a future career in

criminal justice. Additionally, she had only $350.00 in medical expenses, and the jury awarded only $1,000.00 for past and future medical expenses. Her additional testimony was that the nerve condition in her right hand prevented her from performing yard work for extended periods and caused her pain and problems performing her data entry duties at work, but she had not claimed a disability at work or missed any work. Defendants then cite state court cases in which damages for similar-type injuries were between $30,000.00 and $40,000.00.

In response, Humphries states that Defendants' analysis is limited to pain and suffering. Humphries argues that, even if Defendants are correct about the value of the pain and suffering caused by her injuries, then the difference is easily made up by an award of general compensatory damages for emotional distress, loss of liberty, humiliation, and inconvenience.

The Fifth Circuit has instructed the Court as to the proper review when a losing party alleges that the jury awarded excessive damages:

> In determining whether a new trial or remittitur is the appropriate remedy, this Circuit has held that when a jury verdict results from passion or prejudice, a new trial, not remittitur is the proper remedy. *Wells v. Dallas Independent School District*, 793 F.2d 679, 683 (5th Cir.1986) (citing *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir.1985). Damage awards which are merely excessive or so large as to appear contrary to right reason, however, are subject to remittitur, not a new trial. *Id*. "When a jury's award exceed[s] the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so. Our power to grant a remittitur is the same as that of the district court. We determine the size of the remittitur in accordance with this circuit's "maximum recovery rule," which prescribes that the verdict must be reduced to the maximum amount the jury could properly have awarded." *Hansen v. Johns-Manville Products Corp.*, 734 F.2d 1036 (5th Cir.1984) (quoting *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983). . . . A verdict is excessive as a matter of law if shown to exceed "any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." *Kolb v. Goldring, Inc.*, 694 F.2d 869, 871 (1st Cir.1982) (quoting *Glazer v. Glazer*, 374 F.2d 390, 413 (5th Cir.), *cert. denied,* 389 U.S. 831, 88 S.Ct. 100, 19

L.Ed.2d 90 (1967)).

*Brunnemann v. Terra Intern., Inc.*, 975 F.2d 175, 178 (5th Cir. 1992).

While Defendants have moved for a new trial, not remittitur, the entire basis of their argument appears to be that the award is excessive as a matter of law. Other than their initial argument regarding Riddle, they have not alleged or argued jury bias or prejudice. Accordingly, they have not asserted any basis for a new trial.

Even if they had requested remittitur, the Court would deny the motion. The evidence and testimony before the jury was not simply the pain and suffering of Humphries because of this injury, but the particular emotional distress and humiliation caused by the false arrest because she believed, correctly or not, that it prevented her from pursuing her chosen career with the district attorney's office. Additionally, as noted by Humphries, there was no surgical intervention planned and no indication that she would not continue to suffer pain for many years, given her young age of approximately 30 years.

Finally, Defendants argue that the jury's findings of both negligence and intentional misconduct are "irreconcilable." Without citing to any case law, Defendants argue that they are entitled to a new trial because Humphries' Section 1983 claim requires a finding of something more than negligence, and a state law negligence finding precludes a finding of an intentional act.

Humphries responds that the jury's finding was reasonable because the jury could have found that Johns and McElroy deliberately violated her constitutional rights by, in Johns' case, arresting her without probable cause and using excessive force when he refused to loosen her handcuffs, and by, in McElroy's case, failing to intervene in her unlawful arrest when he did not

18

see a crime committed. However, the jury could have also found that Johns acted negligently when he placed the handcuffs on Humphries too tightly because he testified at trial that he normally checks the tightness of the handcuffs.

If a jury gives inconsistent answers to special interrogatories, the case must be remanded for a new trial. *Morrison v. Frito-Lay, Inc.*, 546 F.2d 154, 160 (5th Cir. 1977); *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103, 1106 (5th Cir. 1975). However, answers should be considered inconsistent only if there is no way to reconcile them. *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962); *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973). The test is whether the jury's answers can "be said to represent a logical and probable decision on the relevant issues as submitted." *Id.; Miller,* 508 F.2d at 1106-1107.

In this case, the explanation offered by Humphries' counsel reconciles the jury's verdict as to Johns. Although Humphries does not offer an explanation as to McElroy, the Court finds that the negligence verdict against him is not irreconcilably inconsistent with the Section 1983 verdict either. As noted above, the jury could have found that McElroy intentionally failed to intervene in Humphries' unlawful arrest, a Section 1983 violation. The jury could also have found, however, that McElroy acted negligently in Humphries' arrest or apprehension because (1) he had his back turned and failed to monitor the situation when Humphries was walking towards Timothy Plumley's vehicle, arguably leading to her unlawful arrest, or (2) he failed to check the tightness of Humphries' handcuffs, even after Johns had to use a second pair, relying instead on Johns to check.

Accordingly, the Court finds that Defendants have also failed to show that they are

19

entitled to a new trial on this basis.

### III. Conclusion

For the reasons set forth above, Defendants' Motion to Set Aside Verdict [Doc. No. 62] and Motion for New Trial [Doc. No. 71] are DENIED.

MONROE, LOUISIANA, this 17th day of May, 2006.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE